## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

| | |
|---|---|
| **CITY OF BOWLING GREEN, KENTUCKY**<br>**1001 College Street**<br>**Bowling Green, KY 42101** | ) Case No. <u>1:17-cv-00158-GNS</u><br>)<br>) **(Judge** <u>Greg N. Stivers</u> **)**<br>) |
| **Plaintiff,** | )<br>) **COMPLAINT FOR MONEY DAMAGES**<br>) **AND JURY DEMAND** |
| -v- | )<br>) |
| **MILLS FAMILTY REALTY, INC.**<br>**c/o SKO – Louisville Services, LLC**<br>**2000 PNC Plaza**<br>**500 West Jefferson Street**<br>**Louisville, KY 40202** | )<br>)<br>)<br>)<br>)<br>) |
| **and** | )<br>) |
| **MR GROUP, INC.**<br>**c/o SKO- Louisville Services, LLC**<br>**2000 PNC Plaza**<br>**500 West Jefferson Street**<br>**Louisville, KY 40202** | )<br>)<br>)<br>)<br>)<br>) |
| **and** | )<br>) |
| **CHRIS MILLS**<br>**900 Church Street**<br>**Bowling Green, KY 42101** | )<br>)<br>) |
| **and** | )<br>) |
| **CLINTON MILLS**<br>**900 Church Street**<br>**Bowling Green, KY 42101** | )<br>)<br>) |
| **and** | )<br>) |
| **ED MILLS**<br>**900 Church Street**<br>**Bowling Green, KY 42101** | )<br>)<br>) |
| **and** | ) |

**RICHARD KELLEY**                    )
**1332 Edgewood Avenue**              )
**Bowling Green, KY 42103**           )
                                      )
          **Defendants.**             )

For its Complaint against Mills Family Realty, Inc., MR Group, Inc., Chris Mills, Clinton Mills, Ed Mills, and Richard Kelley (collectively, "Defendants"), the City of Bowling Green, Kentucky ("Plaintiff" or "City"), alleges as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      This is an action for damages arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*., and includes related claims arising under state law for fraud, breach of contract, breach of fiduciary duty, civil conspiracy, and conversion. Defendants, engaged in—and conspired to engage in—a pattern of racketeering activity intended to defraud the Plaintiff out of millions of dollars. Defendants also committed fraud, violated their fiduciary and contractual duties to Plaintiff, and engaged in a civil conspiracy to enrich themselves at the expense of the Plaintiff.

2.      In particular, but without limitation, Defendants wrongfully diverted and illegally used bond funds—which were approved and guaranteed by Plaintiff in connection with the WRAP Project at Block 6 of the Western Kentucky University Gateway to Downtown Bowling Green Tax Increment Financing Development District (the "Project")—to establish and operate their own private businesses. As a direct result of Defendants' tortious and fraudulent conduct, Plaintiff has suffered and continues to suffer several million dollars in damages.

## THE PARTIES

3.      Plaintiff, the City of Bowling Green, Kentucky ("Plaintiff"), is a home rule class city organized and existing under the laws of the Commonwealth of Kentucky, located at 1001 College Street, Bowling Green, Kentucky 42101.

4.      Defendant, Mills Family Realty, Inc. ("MFR") is a Kentucky Corporation with its principal place of business in Bowling Green, Kentucky.    MFR is the successor by merger with MFR of Bowling Green, LLC—formerly known as Mills Family Realty, LLC.

5.      Defendant, MR Group, Inc. ("MR Group") is a Kentucky corporation with its principal place of business located at P.O. Box 839, Bowling Green, Kentucky 42102.    Upon information and belief, MR Group is a wholly-owned subsidiary of MFR.  MR Group and MFR share the same common principles/management.

6.      Defendant, Chris Mills is a citizen of Kentucky and resident of Bowling Green. Upon information and belief, Chris Mills maintains an address of 900 Church Street, Bowling Green, Kentucky 42101.  Chris Mills is an officer and shareholder of MFR and an officer of MR Group.

7.       Defendant, Clinton Mills is a citizen of Kentucky and resident of Bowling Green. Upon information and belief, Clinton Mills maintains an address of 900 Church Street, Bowling Green, Kentucky 42101.  Clinton Mills is an officer and shareholder of MFR and an officer of MR Group.

8.      Defendant, Ed Mills is a citizen of Kentucky and resident of Bowling Green. Upon information and belief, Ed Mills maintains an address of 900 Church Street, Bowling Green, Kentucky 42101.  Ed Mills is an officer and shareholder of MFR and an officer of MR Group.

9.      Chris Mills, Clinton Mills, and Ed Mills are sometimes referred to collectively herein as the "Mills Defendants."

10.     Defendant, Richard ("Rick") Kelley is a citizen of Kentucky and resident of Bowling Green.  Upon information and belief, Rick Kelley resides at 1332 Edgewood Avenue, Bowling Green, Kentucky 42102.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction pursuant to 18 U.S.C. §1964 and 28 U.S.C. § 1331 because this matter involves a federal question.

12.     Defendants are subject to the personal jurisdiction of this Court because they are all citizens and residents of the Commonwealth of Kentucky and they have sufficient minimum contacts with Kentucky to satisfy due process.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and 1391(c) because a substantial portion of the events and/or omissions giving rise to the claims and damages asserted in this Complaint occurred in this district and Defendants have sufficient and proper contacts to subject them to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.      The Western Kentucky University Gateway to Downtown Bowling Green Tax Increment Financing District

14.     On or about August 1, 2007, Plaintiff established the Western Kentucky University ("WKU") Gateway to Downtown Bowling Green Tax Increment Financing Development District ("TIF District"), pursuant to KRS Sections 65.7041 though 65.7083. Plaintiff has subsequently amended the TIF District, and it now includes approximately 383 acres and 52 blocks.

15.     Tax increment financing ("TIF") allows local governments to pledge all or a

portion of the growth in certain tax revenues generated by developments to finance community redevelopment in designated TIF development areas.  Local governments are thus enabled to receive and pledge a portion of certain new revenues generated from state and local governments as a result of the new private development in the TIF development area.

16.     The TIF District was planned to be an approximately $474 million mixed-use commercial, office, residential and hospitality project in downtown Bowling Green, together with site amenities designed to include car traffic, bicycle paths, sidewalks, streetlights, and benches.  Projects to be located in the TIF District must be reviewed and approved by the City Board of Commissioners.

17.     As the TIF District contained various and distinct projects, on May 1, 2012, the Plaintiff, along with Warren County and the Warren County Downtown Economic Development Authority, Inc. (the "Authority") executed an Agreement on Sharing of Revenues ("Revenue Sharing Agreement"), a true and accurate copy of which is attached hereto as **Exhibit A**.  The Revenue Sharing Agreement called for the application of tax incremental revenues collected from *ad valorem* taxes and occupational taxes toward debt service and other financing of the various different projects to be located within the TIF District.

**B.     The Block 6 WRAP Project**

18.     The Block 6 WRAP Project (the "Project") consists of a four-story, mixed-use development that wraps around an 855-space parking garage owned by the Authority.  The development was to include approximately 38,000 square feet of retail and restaurant space, and approximately 68,000 square feet of office space.

19.     In March 2011, Circus Square Development, LLC—a now defunct Kentucky limited liability company owned and operated by Defendant, Rick Kelley—was selected as the

original sub-developer for the Project.  However, due to Kelley's financial troubles, the company was ultimately unable to perform its obligations as sub-developer.

20.     Upon information and belief, Rick Kelley approached the Mills Defendants about their interest in becoming sub-developer for the Project.  At the time, the Mills Defendants had already entered into a lease for office space in the Project for their company, Hitcents.com, Inc. By becoming the sub-developer, however, the Mills Defendants realized that they would be able to become the principals of the Project building.  And as principals, they could generate lease income associated with the property.

21.     On March 13, 2012, the Mills Defendants formed MFR for the sole purpose of becoming the new sub-developer on the Project. On or around May 2012, Defendant, MFR submitted to Plaintiff an application detailing the proposed developments for the Project.  Shortly thereafter, MFR was selected to be the sub-developer for the Project. The estimated start date for the project was June 2012, with a scheduled completion date of December 2014.

22.     In its original application to become sub-developer, MFR represented that the cost of the Project was $21.5 million, and projected approximately $14 million in TIF revenue to be generated by the Project over a 25 year period.  The application was signed by Clinton Mills. While MFR had no construction experience itself, MFR represented that it had the resources to handle the project because of the Mills Defendants' ownership of Hitcents.com, Inc.—which has extensive resources and holdings in construction related companies.  Based on the representations and assurances made by the Mills Defendants, MFR was retained as the sub-developer for the Project.

C.      **Financing the Project**

23.      The Project was financed through the issuance of industrial revenue bonds ("IRBs") issued by Warren County pursuant to KRS Chapter 103, with the payment of the IRBs supported by three sources: (1) TIF revenues pledge by Plaintiff; (2) sublease payments from subtenants; and (3) contingent sublease payments from Plaintiff for the parking structure. Project funds from the IRBs were to be deposited with U.S. Bank, (the "Trustee"), for disbursement to vendors after receiving draw requests from the sub-developer, MFR, with the sources designated to pay the debt on the IRBs to be held by the Trustee in a separate debt service reserve account.

24.      As a general matter, IRBs are a category of financing that allows a city, county, or state to issue bonds for private businesses or activities.  The bonds are used to finance expansion, construction, or acquisition of industrial buildings as defined by KRS Chapter 103.  Here, the bonds were intended to be used for construction and development purposes, and were expected to be repaid by pledging funds to the Project from various sources of revenue, such as the rental income from the Project and Plaintiff's revenues generated within the TIF District.  Plaintiff agreed to pledge certain revenue streams (including its TIF revenues) towards the IRBs' debt service requirements, and to cover any deficiency thereof.

25.      In 2012, Warren County approved the issuance of approximately $22 million in IRBs payable over 25 years for the construction of the Project.  As stated, the bonds were to be paid through both subtenant lease payments and Plaintiff's TIF revenue.  Plaintiff also provided a "backstop" for the repayment of the IRBs by leasing the parking garage from MFR for the amount of any shortfall on debt service payment requirements.  By having Plaintiff backstop the debt payment, the bonds were issued based on Plaintiff's financial backing, allowing for a better

rating by the credit rating agencies and, consequently, lower interest rates.

D.   **Defendants' Fraudulent and Unlawful Conduct**

1.   **The Mills Defendants and MFR Wrongfully Commingled Plaintiff's TIF Revenues—Which Were to Be Used Exclusively for Debt Servicing—with the General Construction Fund.**

26.   From the outset, Plaintiff's TIF revenues that were pledged to Block 6 were to be used exclusively for the annual debt service requirements of the IRBs—all other uses of TIF revenues were expressly restricted.  Under the terms of the Revenue Sharing Agreement, if the TIF funds are not needed for IRB debt service payments, Plaintiff may choose to apply the funds to its general obligation bonds (*i.e.*, toward payment of other projects) or fund the debt service reserve of the IRBs.  In the event of a shortfall on the debt service payments, Plaintiff had subleased the parking garage for amounts agreed to cover any such shortfall.

27.   The Mills Defendants knew that under the terms of the Revenue Sharing Agreement, Plaintiff's TIF revenues were to be used only for debt service and not for construction or other Project costs.  Nevertheless, the Mills Defendants devised a plan to gain access to and improperly use the TIF revenues.  To do so, MFR entered into a conflicting lease agreement with the Authority, and had the IRBs documents (the "Bond Documents"), namely the Trust Indenture,[1] worded in such a way—without Plaintiff's knowledge—that improperly allowed the TIF revenues to be transferred to and commingled with the Project's construction fund.  Plaintiff was neither a party nor a signatory to this lease agreement or the Bond Documents, except to the extent of the City's backstop pledge.

28.   The Mills Defendants and MFR executed this lease agreement and the Bond Documents with the intent to improperly commingle, and thereby have access to, the TIF revenues.  In other words, the Mills Defendants knowingly caused a breach of the Revenue

---

[1] A true and accurate copy of the Trust Indenture is attached hereto as **Exhibit B.**

Sharing Agreement in order to wrongfully obtain access to TIF revenues.  Thus, the TIF revenues were maintained in the incorrect account and commingled with other funds instead of being restricted for their intended use, as required by the Revenue Sharing Agreement.

29.     This improper commingling is reflected in an email, dated April 30, 2013, from Mr. Jeff Meisel, Chief Financial Officer & Director for the City, to Mr. Bruce Wilkerson, Mayor of the City, wherein Mr. Meisel stated that he told Clinton Mills that he disliked the "mix[ing] of all the money into one pot and told [Clinton] the pots (revenue streams) needed to stay segregated where [the City] would know what each source was generating and how much was being used towards debt."  Mr. Meisel also stated that he explicitly told Clinton Mills, "in 2 separate phone calls" that the "*$1.5M reserve [fund] is to be untouched.*"

30.     The reserve fund, however, was eventually depleted by Defendants in its entirety. The TIF revenues, which were required to remain untouched and used exclusively for debt service payments, were wrongfully commingled with the Project's construction fund and spent alongside general construction costs, and which Defendants' unlawfully used to establish and operate their own private businesses.

> **2.     Defendants Materially Altered the Language of the Operating Agreement without Plaintiff's Knowledge in Order to Illegally Use Bond Funds to Establish and Operate Their Own Private Business Ventures.**

31.     In April 2012, Plaintiff approved a draft Operating Agreement relating to the operation of the Project (the "Operating Agreement"), a true and accurate copy of which is attached hereto as **Exhibit C.**  While Plaintiff was not a party to the Operating Agreement, because it agreed to backstop the bonds and pledge its revenues to cover any shortfall, it was entitled to review and approve the Operating Agreement.

32.     The draft Operating Agreement specifically stated that portion of bond proceeds

for the "Tenant Allowance" *could not* be used for working capital.  In particular, Section 1(i) of the draft Operating Agreement provided:

> The Tenant Allowance may be used for design and architecture fees, all interior demising walls, flooring, electrical materials, equipment, furnishings, mechanical, security system installation and wiring, audio/sound system installation and wiring, audio visual setup and wiring, digital signage equipment, coax drops for cable TB locations, voice and data network communications, and any other security components or smart office automation tools, plumbing and life-safety equipment on the Premises. ***The Tenant Allowance may not be used for working capital***.

Exhibit C, at 2 (emphasis added).

33.    In other words, the Operating Agreement—as approved by Plaintiff prior to agreeing to backstop the bond funds—did not allow bond funds to be used for Defendants' own business operations (*i.e.*, working capital and/or operating costs).  They were only to be used in connection with Project costs for construction and renovations.

34.    This explicit language was included in all prior drafts circulated amongst Plaintiff, the Mills Defendants, Rick Kelley, and other involved persons.  Examples include:

> (a)    On April 9, 2012, Rick Kelley sent an email to Plaintiff containing a draft Operating Agreement. Mr. Kelley stated that "[t]here may be some minor changes proposed by [the] Mills . . . but this should be close to the final document." This draft included this explicit language prohibiting the bond funds from being used for working capital; and

> (b)    On April 25, 2012, Rick Kelley emailed Plaintiff containing a revised draft of the Operating Agreement, where he stated, "[I] think I made all the changes we discussed." This revised draft also contained the language prohibiting bond funds from being used for working capital.

35.    After Plaintiff approved the Operating Agreement, Defendants continued to make certain revisions.  Initially, all subsequently revised drafts kept the prohibitive language barring bond proceeds from being used for working capital.  In these drafts, the Defendants also

provided redlined versions of the Agreement, allowing Plaintiff to identify and review all

changes to the Operating Agreement.  Examples of post-approval drafts include:

(a)     On May 1, 2012, Mr. Kevin Brooks (counsel for the Authority) sent to Plaintiff and several City officials a "latest" draft of the Operating Agreement.  This draft Operating Agreement contained the explicit language prohibiting the bond funds from being used for working capital.  It also contained strikethroughs of the provisions to be deleted, and underlined the provisions to be added;

(b)     On May 9, 2012, Rick Kelley email Plaintiff a revised, clean version of the Operating Agreement.  This draft of the Operating Agreement contained the explicit language prohibiting the bond funds from being used for working capital.  It also contained strikethroughs of the provisions to be deleted, and underlined the provisions to be added; and

(c)     On May 24, 2012, Rick Kelley sent Plaintiff a revised, redlined draft of the Operating Agreement.  This draft of the Operating Agreement contained the explicit language prohibiting the bond funds from being used for working capital.  It also contained strikethroughs of the provisions to be deleted, and underlined the provisions to be added.

36.     However, in August 2012—after Plaintiff officially approved the Operating

Agreement—Defendants subsequently altered the Agreement without Plaintiff's knowledge or

consent so that the Tenant Allowance now included working capital as a permitted use.[2]  It was

at this moment that the Mills Defendants and Rick Kelley are believed to have first formed their

fraudulent scheme to illegally use and divert the proceeds of bond funds to operate and establish

their own private business ventures, rather than use them for construction and development

purposes as required by the Project documents and Kentucky law

---

[2] A true and accurate copy of the finalized agreement executed between the MFR and the County is attached hereto as **Exhibit D.**

37.   In particular, Section 1(i) of the altered Operating Agreement provided:

> The Tenant Allowance may be used for any purpose related to the improvements to the shell space, architecture and consulting fees, restaurant licensing, trademark or acquisition agreements, purchase or furniture, fixtures and equipment ("FFE"), ***establish a restaurant operating reserve fund and use for working capital***.

Exhibit D, at 2 (emphasis added).

38.   Kentucky law expressly *prohibits* the use of proceeds of bonds for working capital and operating costs.  KRS 103.240.  This change to the Operating Agreement directly contravened Kentucky law.

39.   The Mills Defendants, MFR, and Rick Kelley effected—and conspired to effect—this change to the Operating Agreement without the knowledge or consent of Plaintiff, and for the purpose of unlawfully using bond funds to fund and operate their private business ventures.

40.   Despite having previously identified and redlined all prior changes to the Operating Agreement via use of the document's "track changes" function, Defendants never once mentioned or notified the City of this particular and unlawful alteration.  Defendants did not highlight, note, or otherwise draw attention to the illicit aforementioned alteration.  Instead, Defendants purposefully and fraudulently concealed the illegal alteration to the Operating Agreement.  As a result, despite Plaintiff's due diligence in reviewing the Operating Agreement after initial approval, Plaintiff was unable to discover the offending provision.

41.   Most tellingly, *only* MR Group, no other subtenant, was permitted under the terms of its sublease agreement with MFR to use the tenant improvement allowance for working capital.  In particular, MFR's sublease agreement with MR Group (unlike all the other sublease agreements) provided that MR Group follow the language in the Operating Agreement to determine how the bond proceeds may be used for tenant improvements.  Indeed, *none of the other five subleases* allowed working capital for tenant allowances; in fact, four of those five

agreements *explicitly prohibited* the use of the allowance for working capital. Simply stated, Defendants' use of bond funds as working capital benefited themselves—and only themselves. No other entity was permitted to use the bond proceeds for working capital.

42.     The alteration to the Operating Agreement made by the Mills Defendants, MFR, and Rick Kelley's fundamentally changed the nature of the transaction that Plaintiff agreed to financially support. Had Plaintiff known that the Operating Agreement was altered to allow bond proceeds to be used as working capital to finance Defendants' private business ventures, Plaintiff would have withdrawn its financial support and would not have agreed to backstop the IRBs or pledge its revenue to cover any shortfall in debt. As a result, the bonds would never have been issued.

### 3.     The Mills Defendants Made Material Misrepresentations and Omissions to Plaintiff Regarding the Initial Approval of Bond Funds and Their Subsequent Request for Additional Bond Funds.

43.     In MFR's original application to become sub-developer, MFR represented that the cost of the Project was $21.5 million, and projected approximately $14 million in TIF revenue to be generated by the Project over a 25 year period. The estimated start date for the project was June 2012, with a scheduled completion date of December 2014.

44.     Instead, Mr. Kelley and the Mills Defendants devised to use the "tenant improvement funds" (*i.e.*, "Tenant Allowance" a/k/a bond proceeds to be used for Project renovations and improvements) as working capital to cover the operating costs of their separate, private business ventures (*e.g.,* restaurants, etc.), which they planned to open and operate at the Block 6 Project site. Defendants either knew or should have known that, as a result of their using the bond funds for working capital and operating expenses, the bond amount would be insufficient to cover the Project's actual and intended construction/development costs.

45.     However, in all of their numerous email and telephone communications with Plaintiff during Project construction, the Defendants—despite knowing that Project funds were being used unlawfully as working capital to cover operating costs—continuously failed to disclose and intentionally concealed their illicit conduct.  Indeed, each such email and telephone communication wherein Defendant's omitted such material information constitutes a separate act of fraud.

46.     In March 2013, the Mills Defendants advised Plaintiff that the $22 million was not enough to complete the Project and that they needed additional funds in order to pay for the Project's construction costs.  The Mills Defendants represented that additional funds were needed because construction costs were greater than originally expected due to certain "unanticipated items."  In reality, Project funds were insufficient because Defendants were illegally using bond for their own private businesses—a fact they knowingly and continuously failed to disclose to Plaintiff.

47.     The Defendants instead made certain representations and false assurances to Plaintiff—via email and oral correspondence and at public hearings—that the Project was progressing as scheduled and that the bond funds were being used properly.  For example, in one specific email dated April 2, 2013, Clinton Mills responded to a question from City Attorney Gene Harmon, wherein Mr. Harmon asked whether MFR was requesting total access to the bond funds.  In response, Clinton Mills stated, "If you mean by total access that we would want to keep that money and spend it however we please, *then no we are not asking for total access.  We would just want to use the money for renovations and taxes just like all other money* ([and] only if there is [money] left over after the debt payment)." (emphasis added).  This statement was utterly false; the Mills Defendants, MFR, and Rick Kelley, wanted to continue using the money

to operate their own private businesses, including their restaurants.

48.     In May 2013, the Mills Defendants met again with Plaintiff to discuss the Project. The Mills Defendants restated that there were cost overruns due to unanticipated items, and that additional funds were to be used to complete construction, provide renovations should a tenant leave, and cover potential tax consequences.  At no point during this meeting did the Mills Defendants disclose that they spent—and were going to continue spending—bond funds on establishing and operating their own private businesses.

49.     Defendants also omitted from disclosing to Plaintiff their specific intention of using the Project and bond funds as a springboard for opening their own restaurants at Block 6. During all relevant negotiations and discussions, the Mills Defendants and Rick Kelley represented to the Plaintiff that they planned to have national chains occupy the first-floor restaurant spots.  In reality, unbeknownst to the Plaintiff, the Mills Defendants and Rick Kelley intended to open and operate their own restaurants, and to illegally use bond funds to finance their restaurants' operating costs.  For instance, as early as December 2012, MFR, MR Group, and Rick Kelley (and his affiliated entities), executed a Restaurant Management Agreement. Upon information and belief, pursuant to this agreement, MFR used series 2012 bond proceeds to pay Mr. Kelley (through his affiliated entity, CCC Hospitality Group, LLC ("CCC")) approximately $150,000 for restaurant management consulting fees.  In addition, upon information and belief, MFR paid Mr. Kelley (through CCC) another $25,000 in consulting fees on April 25, 2014 and a $100,000 bonus ($25,000 paid on May 2, 2014; $75,000 paid on May 9, 2014) for restaurant management services.

50.     In May 2013, Plaintiff's Mayor posed a direct question to the Mills Defendants asking whether Rick Kelley had any involvement with the restaurants located on the Project's

property.  The Mayor expressly stated that the bond funds are not a "Rick Kelley Bankruptcy Bailout Fund," and that, were Rick Kelley to be at all involved, Plaintiff would not approve any additional bonds.  In response, the Mills Defendants: (i) gave false assurances that Rick Kelley had no involvement—and would continue to have no involvement—in the Project or the operating of the restaurants; (ii) misrepresented their plan for Rick Kelley to operate several restaurants; and (iii) failed to disclose they had already used bond funds to pay Rick Kelley consulting fees to develop the restaurants on the Project's property.  In fact, upon information and belief, Rick Kelley eventually earned as much as $2.07 million dollars from his involvement with the Project.

51.     Defendants viewed the bond proceeds not only as a means for financing new businesses, but also as a resource for keeping afloat those business that were on the verge of bankruptcy.  For example, in an email dated May 10, 2013 from Rick Kelley to Clinton Mills (cc'ing Chris Mills and Ed Mills), Rick Kelley stated, "I'm suggesting that you propose leasing Mariah's [*i.e.*, Rick Kelley's restaurant] for one year with an option to purchase at the end of the lease . . . . If [the City] say[s] no, I'll have to close Mariah's by the end of August and either move to block 6 or close and reopen later.  If they say yes, we can stay there for a year and then make the move."  This email reflects Rick Kelley's and the Mills Defendants' intention of not only operating their own restaurants at Block 6, but also that the Project and bond funds were viewed as a lifeline for their businesses that were struggling financially.

52.     In June 2013, the Mills Defendants again appeared before Plaintiff to explain the purpose of the additional $5 million bond issuance.  The Mills Defendants once again reiterated that construction costs were higher than expected and that additional funds were needed to complete construction of the Project.  And once again, the Mills Defendants failed to disclose

that bond funds were being used—and would continue being used—to cover operating costs of Defendants' privately-owned businesses, such as their restaurants.

53.     It was not until July 10, 2013, MFR—via Clinton Mills—provided Plaintiff with a term sheet indicating that its subsidiary, MR Group, was subleasing a space on the Block 6 Project.  While the Mills Defendants herein notified Plaintiff of their intention to operate their own restaurant at Block 6, at no point did they inform Plaintiff that the bond funds would be used as working capital to finance the operating costs of MR Group.  As further discussed *infra*, MR Group was the only subtenant that was allowed to use tenant allowance for working capital; no other subtenant was permitted to do so (in fact, most other subtenants were explicitly prohibited by their sublease agreement from using bond funds for working capital).

54.     Defendants' fraudulent omissions are reflected by an October 14, 2013 email between Rick Kelley and Clinton Mills, wherein Mr. Kelley stated "I think your *[sic]* wise to meet with Bruce[3] alone.  I don't think its wise to show him anything . . . . I think it's ridiculous that [the City] questions[s] your plan.  I don't think politicians should question how you want to protect your investment."  This email makes clear that the Mills Defendants and Rick Kelley had many private discussions and secret "plans" about the Project's development and operations that they purposefully concealed from telling Plaintiff.

55.     As a result of the continuous misrepresentations and omissions made by the Mills Defendants and Rick Kelley, Plaintiff agreed to issue and backstop and pledge its TIF revenue to financially support an additional $5 million in IRBs for the Mills Defendants and MFR to use to complete construction of the Project.

---

[3] "Bruce" is in reference to Bruce Wilkerson, the Mayor of Bowling Green, Kentucky.

4.      **The Mills Defendants and MFR Made False Certifications to U.S. Bank for Disbursement of Bond Funds.**

56.     Throughout this entire time period, the Mills Defendants also repeatedly made misrepresentations to the bond Trustee, U.S. Bank.  In particular, in every disbursement request submitted by the Mills Defendants to U.S. Bank requesting access to bond funds, MFR certified to U.S. Bank that "the work on the Project has progressed as indicated, the quality of the work is in accordance with the Contract Documents, and all applicants are entitled to payments of the amounts requested . . . ."  This certification was entirely false—the Project had not progressed as indicated, the work was not in accordance with Contract Documents, and—because the Project fund was no longer in balance—MFR was not entitled to the requested disbursement.

57.     The Mills Defendants also certified in the disbursement request form to U.S. Bank that the "disbursement request is not related to the construction of the Project."  Indeed, the Mills Defendants and MFR were entitled to use bond funds toward tenant improvement allowances.  However, as stated in the originally-approved Operating Agreement and as required by Kentucky law, such funds were not to be spent toward working capital and operating costs.  Nevertheless, the Mills Defendants wrongfully certified, improperly received, and subsequently misappropriated over $2 million of bond funds toward working capital in order to operate their own separate businesses.

58.     Between 2013–15, the Mills Defendants made over 20 wrongful certifications via disbursement requests to U.S. Bank for tenant improvement draws in order to improperly receive the bond proceeds and use such sums to operate their own private businesses.

59.     Examples of such disbursement requests include, but are not limited to the following:

- 18 -

1)   On March 13, 2013, MFR requested a $20,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

2)   On April 24, 2013, MFR requested a $20,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

3)   On June 11, 2013, MFR requested a $30,000.000 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

4)   On August 26, 2013, MFR requested a $20,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

5)   On February 4, 2014, MFR requested a $30,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

6)   On March 7, 2014, MFR requested a $30,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

7)   On April 10, 2014, MFR requested a $150,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

8)   On May 2, 2014, MFR requested a $432,902.40 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

9)   On May 16, 2014, MFR requested a $60,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

10)  On June 6, 2014, MFR requested a $150,000.00 disbursement of bond funds from U.S. Bank for tenant

improvement allowance, which the Mills Defendants illegally used as working capital;

11)     On June 19, 2014, MFR requested a $75,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

12)     On July 2, 2014, MFR requested a $125,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

13)     On July 18, 2014, MFR requested a $150,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

14)     On July 31, 2014, MFR requested a $100,00.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

15)     On August 14, 2014, MFR requested a $50,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

16)     On September 3, 2014, MFR requested a $75,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

17)     On September 12, 2014, MFR requested a $50,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

18)     On September 25, 2014, MFR requested a $97,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

19)     On October 15, 2014, MFR requested a $200,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital;

20) On November 21, 2014, MFR requested a $40,000.00 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital; and

21) On January 22, 2015, MFR requested a $126,830.61 disbursement of bond funds from U.S. Bank for tenant improvement allowance, which the Mills Defendants illegally used as working capital

60. These fraudulent disbursement requests represent a total of over $2 million in bond funds, which were improperly used by Defendants as working capital to cover operating costs and finance the Mills Defendants and Rick Kelley's own private businesses, including, but not limited to, their restaurants at the Block 6 development.

> **5.** **Defendants Improperly Used and Overspent TIF Revenues and Bond Proceeds on Working Capital for Their Own Benefit, Resulting in the Project's Collapse.**

61. MFR was contractually obligated to keep the Project fund in balance at all times. MFR also agreed that if for any reason the amount of Project fund proceeds was insufficient, MFR would deposit into the Project fund a sufficient sum to satisfy the amount of any such insufficiency. Despite this clear contractual obligation, MFR and the Mills Defendants bilked the Project fund of its liquidity, and purposefully failed to replenish its deficiency. As stated in the aforementioned sections, MFR and the Mills Defendants wrongfully commingled TIF revenues with construction funds and used said funds as working capital to establish and operate their own private business ventures.

62. MFR allowed MR Group—and *only* MR Group, no other subtenant—to use the tenant improvement allowance for working capital. In particular, MFR's sublease agreement with MR Group (unlike all the other sublease agreements) provided that MR Group follow the language in the Operating Agreement to determine how the bond proceeds may be used for tenant improvements. Indeed, *none of the other five subleases* allowed working capital for tenant

allowances; in fact, four of those five agreements *explicitly prohibited* the use of the allowance for working capital.  Simply stated, Defendants' use of bond funds as working capital benefited themselves—and only themselves.  No other entity was permitted to use the bond proceeds for working capital.

63.     MFR and the Mills Defendants also allowed overspending of bond proceeds on costs and expenditures not permitted under either the construction contract between MFR and Alliance (which allocated a set amount per square foot for tenant improvements)[4] or the sublease agreement with its subsidiary-subtenant, MR Group.  Under either the construction contract or the sublease agreement—both of which provided a total tenant allowance—MR Group was permitted to spend no more than $5.5 million for tenant improvements.[5]

64.     MFR, however, improperly allowed its subtenant, MR Group, to spend amounts grossly beyond the allocation amount provided for in the construction contract.  MFR ultimately spent *over $12.7 million* on tenant improvements for restaurants and banquet space leased and operated by its subsidiary, MR Group. (An amount over $9 million more than the total allowance in the construction agreement, and over $7 million more than that allowed in the sublease agreements.)  This was done for the sole benefit of the Mills Defendants, who are all owners and operators of both MFR and MR Group.

65.     As a result, by allowing MFR's sublease agreement with its subsidiary, MR Group, to have a higher allowance for tenant improvements and to include working capital as a

---

[4] The allocation amount set forth in the construction contract was based on the total amount of bond proceeds available for tenant improvement and was put in place to ensure adequate funding would be available to complete the Project. However, the sublease agreements executed between MFR and its subtenants, including MR Group, failed to follow the limitations set forth in the construction contract and, instead, set forth its own limitation amount.

[5] Under the construction contract, MR Group had a total allowance of $3.57 million.

permitted use, the bond funds were inadequate to cover legitimate tenant improvement expenses. Because MFR allowed MR Group to use bond funds as working capital and failed to restrict the amount spent on tenant improvements to the amounts provided for in the construction contract, the Project budget became out of balance, resulting in a severe shortage of bond funds available to complete the rest of the Project.

66.    Moreover, due to their wrongful expenditures of bond funds, MFR and the Mills Defendants no longer had sufficient bond funds to fulfill their contractual obligations, pay their contractors, or complete the Project, resulting in a total collapse of the Project. Indeed, several contractors on the Projects were never paid for their work on the Project, resulting in several lawsuits and mechanics liens.   For example, MFR failed to pay Alliance—the master developer—approximately $1.8 million for construction expenses on the Project.

\*       \*       \*

67.    In sum, Defendants wrongfully diverted and illegally used the proceeds of bonds—approved and guaranteed by Plaintiff in connection with the WRAP Project at Block 6—to establish and operate their own separate businesses.  Defendants did so by making, throughout a 2–3 year period, numerous misrepresentations and fraudulent omissions regarding the use of bond funds and status of Project construction/development.  Plaintiff did not discover—nor could it reasonably have discovered—this fraudulent conduct (and Plaintiff's resulting injury) until sometime in 2014–15, when the Project unraveled and Defendants' fraudulent conduct came to light.  As a direct result of Defendants' tortious and fraudulent conduct, Plaintiff has suffered and continues to suffer several million dollars in damages.

## COUNT I
## RICO Violations under 18 U.S.C. § 1962(a)

68.     Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

69.     Defendants MFR, MR Group, Chris Mills, Clinton Mills, Ed Mills, and Rick Kelley are each either a legal entity or legal person who joined together to form an associated-in-fact enterprise ("Enterprise") separate and apart from the pattern of racketeering described herein.

70.     The enterprise engaged in the financing and constructing of a commercial real estate development, as well as the operating of restaurants, thereby engaging in, and otherwise affecting, interstate commerce.

71.     The aims of the Defendants' scheme is to fraudulent divert, misappropriate, and use millions of dollars of bond proceeds intended to fund construction and development of the commercial development.   The scheme consists of various and numerous racketeering acts surrounding the Project, wherein Defendants made repeated and continuous fraudulent misrepresentations and omissions in order to wrongfully and illegally divert and use millions of dollars of bond proceeds to fund their private business ventures.

72.     Such acts include, but are not limited to: (1) Defendants failure to disclose their plans to use bond funds not for Project construction but instead to finance their own private business ventures; (2) Defendants' failure to affirmatively disclose to Plaintiff that the draft Operating Agreement had been materially altered in violation of Kentucky law and substantially changing the financial obligation that Plaintiff agreed to finance and support; (3) Defendants' fraudulent misrepresentations to Plaintiff that an additional $5 million bond was sufficient to complete Project construction, when they knew it was not; and (4) Defendants' false statements

to Plaintiff as to why the original bond proceeds were insufficient to complete the Project construction.

73.     Defendants furthered their scheme through false representations and material omissions made via mail and wire transmissions.  In addition to the misrepresentations described above, Defendants made false representations and material omissions in emails and oral communications regarding Project operational documents, contracts, financing documents, and in other documents relating to the financing and construction of the Project.

74.     Defendants also furthered their scheme by inducing U.S. Bank to disburse bond funds for uses that were in violation of Kentucky law.

75.     Defendants often used misrepresentations to conceal and protect their lucrative scheme and facilitate its successful continuation into the future.  For example, Defendants fraudulently told Plaintiff that the Project required an additional $5 million in financing, and supported these misrepresentations through a pattern of oral and written communications leading up to and following the additional disbursement.

76.     The manner in which Defendants participated in and conducted the affairs of the Enterprise constitutes a pattern of racketeering acts that includes, but is not limited to, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and bank fraud under 18 U.S.C. § 1344.  All of the racketeering acts described herein relate to Defendants' scheme to siphon millions of dollars of bond proceeds from the Project to finance their own private business ventures.  Defendants' predicate acts are too numerous to list, and continued for at least 2–3 years.

77.     This pattern of racketeering activity was the proximate cause of injury to Plaintiff, resulting in the damages described herein, the precise amount of which to be proven at trial.

78.     Plaintiff is entitled to recover three times their damages and costs, including attorneys' fees, incurred in pursuing this action.

## COUNT II
### RICO Violations under 18 U.S.C. § 1962(a)

79.     Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

80.     Defendants MFR, MR Group, Chris Mills, Clinton Mills, Ed Mills, and Rick Kelley are each either a legal entity or a legal person.

81.     Defendants received income (*i.e.*, bond proceeds) directly and indirectly from the pattern of racketeering activity described herein.   As further discussed *supra*, Defendants' predicate acts are too numerous to list, but include numerous false representations and material omissions via mail and wire transmissions continuing for a period of at least 2–3 years.   Such acts include, but are not limited to: (1) Defendants failure to disclose their plans to use bond funds not for Project construction but instead to finance their own private business ventures; (2) Defendants' failure to affirmatively disclose to Plaintiff that the draft Operating Agreement had been materially altered in violation of Kentucky law and substantially changing the financial obligation that Plaintiff agreed to finance and support; (3) Defendants' fraudulent misrepresentations to Plaintiff that an additional $5 million bond was sufficient to complete Project construction, when they knew it was not; (4) Defendants' false statements to Plaintiff as to why the original bond proceeds were insufficient to complete the Project construction; and (5) Defendants unlawfully inducing U.S. Bank to disburse bond funds for uses that were in violation of Kentucky law.   These acts constitute mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and bank fraud under 18 U.S.C. § 1344.   All of the racketeering acts described herein relate to Defendants' scheme to siphon millions of dollars of bond proceeds from the

Project to finance their own private business ventures.

82.     Defendants used and invested this income, directly and indirectly, in the operation and establishment of other business entities owned and operated by the Mills Defendants and Rick Kelley.  These investments include, without limitation, the use of bond funds as working capital to cover operating costs of the Mills Defendants and Rick Kelley's own private business ventures—which engaged in, or otherwise affected, interstate commerce.

83.     The investment of the bond proceeds yielded by Defendants' pattern of racketeering activity was the proximate cause of injury to Plaintiff, constituting an investment injury and resulting in damages, the precise amount of which to be proven at trial.

84.     Plaintiff is entitled to recover three times their damages and costs, including attorneys' fees, incurred in pursuing this action.

## COUNT III
### RICO Violations under 18 U.S.C. § 1962(d)

85.     Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

86.     Defendants conspired to conduct and participate in the affairs of the Enterprise through a pattern of racketeering acts described herein, and to invest the proceeds of their scheme in their own separate, private business ventures.

87.     Defendants received a financial benefit from their involvement in the above conspiracies.

88.     As a proximate result of this multi-faceted conspiracy, Plaintiff suffered the damages described herein, the precise amount of which to be proven at trial.

89.     Plaintiff is entitled to recover three times their damages and costs, including attorneys' fees, incurring in pursuing this action.

## COUNT IV
**Common Law Fraud**

90.     Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

91.     Defendants made intentional misrepresentations to Plaintiff, and intentionally omitted material information under circumstances where Defendants had a duty to disclose, including but not limited to: (1) Defendants failure to disclosure their plans to use bond funds not for Project construction but instead to finance their own private business ventures; (2) Defendants failure to affirmatively disclose to Plaintiff that the draft Operating Agreement had been materially altered in violation of Kentucky law and substantially changing the financial obligation that Plaintiff agreed to finance and support; (3) Defendants fraudulent misrepresentation to Plaintiff that an additional $5 million bond was sufficient to complete Project construction, when they knew it was not; and (4) Defendants false statements to Plaintiff as to why the original bond proceeds were insufficient to complete the Project construction.

92.     Plaintiff reasonably relied upon the Defendants' misrepresentations and omissions.  But for these misrepresentations and omissions, Plaintiff would not have approved and agreed to financially support the Project bonds.

93.     Plaintiff has been damaged as a direct result of Defendants' material misrepresentations and/or omissions, and is entitled to recover damages resulting from said fraud, the precise amount of which to be proven at trial.

## COUNT V
### Breach of Contract Against MFR

94.     Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

95.     Certain contracts and agreements existed between the Plaintiff and MFR whereby MFR was authorized and agreed to spend bond funds for lawful purposes in furtherance of Project completion.

96.     MFR breached said contracts with Plaintiff by spending bond funds for unlawful purposes and for the benefit of MFR and its principals, agents, and affiliates.

97.     Plaintiff has been damaged as a direct result of MFR's breach of contract and is entitled to recover damages resulting from said breach, the precise amount of which to be proven at trial.

## COUNT VI
### Breach of Duty of Good Faith and Fair Dealing Against MFR

98.     Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

99.     MFR entered into certain contracts and agreements with the Plaintiff whereby MFR agreed to build and complete the Project with the financing provided by the bonds.

100.     As further alleged herein, MFR knowingly and intentionally failed to take all reasonable actions necessary to carry out its obligations under said contracts, resulting in a total failure to of its contractual obligations.

101.     MFR's actions and inactions breached the implied covenant of good faith and fair dealing.

102.     Plaintiff has been damaged as a direct result of MFR's breaches and is entitled to

recover damages resulting from said breach, the precise amount of which to be proven at trial.

<u>COUNT VII</u>
<strong>Breach of Fiduciary Duty Against MFR, the Mills Defendants, and Rick Kelley</strong>

103.   Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

104.   MFR, the Mills Defendants, and Rick Kelley all owed Plaintiff a fiduciary duty, including, but not limited to: (i) the duty to exercise good faith in their dealings with Plaintiff; and (ii) to make full and truthful disclosures of all material facts to Plaintiff.

105.   MFR, the Mills Defendants, and Rick Kelley breached said fiduciary duties by: (i) failing to disclose that TIF revenues were commingled with construction costs; (ii) failing to disclose their intent to use bond proceeds to pay for the operation of their own restaurants; (iii) failing to disclose Rick Kelley's involvement in the Project; and (iv) misrepresenting that the additional $5 million bond issuance was necessary due to an increase in costs and tax issues.

106.   Plaintiff has been damaged as a direct result of MFR, the Mills Defendants, and Rick Kelley's breach of fiduciary duties and is entitled to recover damages resulting from said breach, the precise amount of which to be proven at trial.

<u>COUNT VIII</u>
<strong>Conversion Against MFR, the Mills Defendants, and Rick Kelley</strong>

107.   Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

108.   MFR, the Mills Defendants, and Rick Kelley wrongfully and illegally converted bond funds for their own personal benefit, and for the benefit of their related and affiliated entities.

109.   MFR, the Mills Defendants, and Rick Kelley did so with the intent and purpose of

- 30 -

using the bond funds for their own personal benefit and the benefit of their related entities, in violation of MFR's contractual obligations and Kentucky law.

110.    Plaintiff has been damaged as a direct result of the conversion and is entitled to recover damages resulting from said conversion, the precise amount of which to be proven at trial.

### COUNT IX
### Civil Conspiracy

111.    Plaintiff incorporates the allegations in each of the preceding paragraphs of the Complaint as if fully rewritten herein.

112.    Defendants entered into a civil conspiracy having numerous unlawful purposes, including, without limitation, the misappropriation and misuse of bond proceeds financially authorized and supported by Plaintiff to construct the Project.

113.    In furtherance of that civil conspiracy, each Defendant committed certain overt acts as described herein, including acts to obtain, or help to obtain, bond proceeds and TIF revenues on false pretenses.

114.    As a direct and proximate result of Defendants' fraudulent and conspiratorial conduct, Plaintiff has suffered and is entitled to recover certain damages described herein, the precise amount of which to be proven at trial.

**WHEREFORE**, Plaintiff request that this Court enter judgment in its favor against Defendants as follows:

(a)    as to Count One, a judgment for damages against all Defendants in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00, before trebling;

(b)     as to Count Two, a judgment for damages against all Defendants in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00, before trebling;

(c)     as to Count Three, a judgment for damages against all Defendants in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,00.00, before trebling;

(d)     as to Count Four, a judgment for damages against all Defendants in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00;

(e)     as to Count Five, a judgment for damages against MFR in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00;

(f)     as to Count Six, a judgment for damages against MFR in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00;

(g)     as to Count Seven, a judgment for damages against MFR, the Mills Defendants, and Rick Kelley in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00;

(h)     as to Count Eight, a judgment against MFR, the Mills Defendants, and Rick Kelley in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00;

(i)     as to Count Nine, a judgment for damages against Defendants in favor of Plaintiff according to proof, but in an amount that is believed to exceed $500,000.00;

(j)     on all Counts, an award of pre-judgment and post-judgment interest, attorney's fees, costs and other expenses in connection with the prosecution and defense of

this action and permissible under the applicable law, and such other relief as this

Court may deem just and equitable.

Respectfully submitted,


  /s/ Steven C. Coffaro
Steven C. Coffaro (86202)
Collin L. Ryan (97541) (admission to W.D. Ky pending)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
Phone:  (513) 579-6400
Fax:  (513) 579-6457
steve.coffaro@kmklaw.com
cryan@kmklaw.com

H. Eugene Harmon (82549)
City Attorney for the City of Bowling Green
P.O. Box 430
1017 College Street
Bowling Green, Kentucky 42101
Phone: (270) 393-3038
Fax: (270) 393-3032
gene.harmon@bgky.org

*Attorneys for Plaintiff,*
*City of Bowling Green, Kentucky*

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

<u>/s/  *Steven C. Coffaro*</u>
Steven C. Coffaro (86202)

7858481.1